# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| CHARLOTTE JEMISON, ADMINISTRATRIX OF THE ESTATE OF DECEASED VESTA JANIQUEA COX, *et al.*, | Case No. 1:21-cv-01028 |
| | JUDGE PAMELA A. BARKER |
| Plaintiffs, | |
| -vs- | |
| | MEMORANDUM OPINION AND ORDER |
| AFIMAC GLOBAL, | |
| Defendant. | |

Currently pending is Defendant AFIMAC Global's Motion for Summary Judgment.  (Doc. No. 38.)  Plaintiffs Charlotte Jemison, administratrix of the estate of deceased Vesta Janiquea Cox, and Shelitha Jones filed an Opposition to AFIMAC's Motion, to which AFIMAC replied.  (Doc. Nos. 42, 43.)  For the following reasons, AFIMAC's Motion is GRANTED IN PART and DENIED IN PART.

## I.     Background

### A.     Factual Background

AFIMAC is a crisis response company that contracts with public and private companies to provide services such as skilled labor and security, as well as some food service and logistical support, during crises like strikes, natural disasters, and the like.  (Ed Zukowski Depo., Doc. No. 42-4, PageID# 534.)  In March 2020, at the onset of the COVID-19 pandemic, AFIMAC contracted with Cheniere Energy to provide food and housing services to the employees at Cheniere's Cameron, Louisiana facility so that Cheniere's employees could be safely "locked in" at the facility to avoid

disrupting Cheniere's production during the early days of the pandemic. (John Threadgill Depo., Doc. No. 42-5, PageID# 612.) To serve Cheniere, AFIMAC hired a variety of workers to provide food, laundry, and housing services at the Cheneiere site. (*Id.* at PageID# 613.)

Two of these workers included Janiquea Cox[1] and Shelitha Jones. Ms. Cox and Ms. Jones arrived together in Beaumont, Texas on April 2, 2020 to start work for AFIMAC. (Shelitha Jones Depo., Doc. No. 42-1, PageID# 483-84.) Upon their arrival in Beaumont, Ms. Cox and Ms. Jones were instructed to meet with John Threadgill, the project manager for the Cheniere site, at the Beaumont Marriott Residence Inn. (Doc. No. 42-1, PageID# 485; Doc. No. 42-5, PageID# 613.) AFIMAC used the Beaumont Inn as a staging and onboarding site for AFIMAC employees en route to the Cheniere site. (Doc. No. 42-1, PageID# 485.) Threadgill instructed Ms. Cox and Ms. Jones to meet him in a hotel room to complete hiring paperwork. (*Id.*) Also present at that meeting between Threadgill and Ms. Cox and Ms. Jones was Troy Jones, the food service manager. (*Id.* at PageID# 486; *see also* Terry Hatchell Depo., Doc. No. 42-6, PageID# 655.) Threadgill informed Ms. Cox and Ms. Jones that they would be assigned to work in the laundry department and that Troy Jones would be their supervisor. (*Id.* at PageID# 485-86.) According to Terry Hatchell, the assistant project manager at the Cheniere site, Troy Jones was responsible for overseeing food service and laundry service. (Doc. No. 42-6, PageID# 655.)

On April 3, 2020, Ms. Cox and Ms. Jones hung around the Beaumont Inn, waiting for a transfer to the Cheniere site. (Doc. No. 42-1, PageID# 485-86.) On April 4, 2020, around 5:30 a.m., Ms. Cox and Ms. Jones went to the hotel lobby to catch an AFIMAC van that would transport them to the Cheniere site. (*Id.* at PageID# 487.) Ms. Jones saw several AFIMAC employees board a large

---

[1] Ms. Cox passed away during the pendency of this litigation. (*See* Doc. No. 25.) The Court substituted Ms. Cox's mother, Charlotte Jemison, the administratrix of Ms. Cox's estate, as a plaintiff in this matter. (Doc. No. 26.)

white passenger van.  (*Id.*)  However, Troy Jones told Ms. Cox and Ms. Jones that they should ride

with him in his personal vehicle instead of taking the van to the Cheniere site.  (*Id.* at PageID# 488.)

According to Ms. Jones, she and Ms. Cox were the only AFIMAC employees that Troy Jones drove

to the work site.  (*Id.*)  According to Troy, he drove other people besides Ms. Jones and Ms. Cox to

the work site that morning but could not recall specifically who those people were.  (Troy Jones

Depo., Doc. No. 42-7, PageID# 678.)  According to Ms. Jones, while en route to Cheniere, Troy

Jones commented on Ms. Cox's body, asked if she had a boyfriend, and then said "He must be a crazy

man because I know you drive him crazy with your long legs."  (Doc. No. 42-1, PageID# 488.)  Ms.

Jones testified that Troy Jones's comment came out of nowhere and that she heard him say it to Ms.

Cox.  (*Id.*)  Ms. Jones remembered Ms. Cox told Troy Jones that that was none of his business and

that Troy Jones laughed her off.  (*Id.*)

### 1.    Plaintiffs' Trailer and Living Quarters

When Ms. Cox and Ms. Jones arrived at the work site, they selected a sleeping trailer to live

in for the duration of the Cheniere job.  (*Id.* at PageID# 489-90.)  The precise layout of the Cheniere

sleeping trailers is a matter of great dispute within the record.  According to Ms. Jones, a single trailer

contained two sets of bunk beds, a sink, and a toilet.  (*Id.* at PageID# 491.)  The trailers had two

doors, a front door and side door.  (*Id.* at PageID# 493.)  Ms. Jones testified that the doors did not

lock.  (*Id.*)  According to Threadgill, the trailers actually contained multiple sets of living quarters,

each with two sets of beds.  (Doc. No. 42-5, PageID# 619.)  Threadgill did not believe that there were

doors that connected the separate living quarters within the trailers but believed that each living

quarters was separated by a wall.  (*Id.*)  Threadgill further testified that two people were assigned to

stay in each living quarters.  (*Id.*)  Troy Jones testified that he assigned Ms. Cox and Ms. Jones to

their trailer, and that each trailer had multiple rooms within it.  (Doc. No. 42-7, PageID# 677.)  Troy Jones testified that there were multiple doors in each room, including doors that led from one living quarters to another.  (*Id.*)

There is also significant dispute over whether some or any of the doors in the trailers locked.  According to Ms. Jones, none of the doors in her living quarters locked.  (Doc. No. 42-1, PgaeID# 493.)  According to Threadgill, he never investigated whether any of the doors in the trailers had locks on them.  (Doc. No. 42-5, PageID# 619.)  According to Ed Zukowski, head of AFIMAC's human resources department, he also never investigated whether the doors to the trailers locked.  (Doc. No. 42-4, PageID# 543.)  According to Troy Jones, all of the doors in the trailers, including those separating the private living quarters, had locks on them.  (Doc. No. 42-7, PageID# 677.)

At some point—the record is not clear when—Ms. Cox and Ms. Jones tied a bedsheet onto one of their doorknobs to keep Troy Jones from entering their room.  (*See* Defendant Ex. H.)  In one video taken by Ms. Cox (the "Bedsheet Video"), one door (which has a bedsheet tied around the handle) appears to have a circular lock underneath the doorknob.  (*Id.*)  Ms. Cox does not open this door in the video, so it is unclear where this door leads.  However, another door with a grate on the bottom, adjacent to the door with the bedsheet tied on, does not appear to have any lock beneath the handle.  (*Id.*)  This door appears to lead to another interior space within the trailer.  (*Id.*)  A third door, adjacent to the sink, also appears not to have any lock under the doorknob.  (*Id.*)  This door seems to lead to another living quarters, with its own sets of bunks.  (*Id.*)  There is a fourth door in this other living quarters, that leads to the exterior of the trailer.  (*Id.*)

4

### 2.    Troy Jones Harasses Ms. Cox and Ms. Jones

According to Ms. Jones, after she and Ms. Cox arrived at the Cheniere site and moved into their trailer, Troy Jones began harassing them.  (Doc. No. 42-1, PageID# 494.)

Ms. Jones testified that Troy Jones came into their trailer unannounced and uninvited "several times."  (Doc. No. 42-1, PageID# 499-500.)  Troy Jones's first alleged unannounced visit occurred the day that Ms. Cox and Ms. Jones moved in.  (*Id.* at PageID# 507.)  At some point that day, Troy Jones came into their trailer unannounced while Ms. Cox was changing her clothes and had her shirt off.  (*Id.*; *see also* S. Jones 4/8/2020 Written Statement, Doc. No. 42-11; J. Cox 4/8/2020 Written Statement, Doc. No. 42-12.)  Ms. Jones heard Troy say to Ms. Cox, "You don't have anything I want to see.  Your titties are too small."  (*Id.* at PageID# 520; Doc. No. 42-12.)

After that incident, Ms. Cox and Ms. Jones attempted to block at least one of the doors to their living quarters to keep Troy from entering their room unannounced.  (Doc. No. 42-11.)  Sometime later that day, Troy came in from a different door, observed that another door was blocked, and said "Oh, y'all locking me out?," to which Ms. Cox and Ms. Jones responded yes, because he didn't belong in their room.  (*Id.*)

The next day, Ms. Jones claims that Troy again entered their room uninvited with a flashlight.  (*Id.*; *see also* Doc. No. 42-1, PageID# 494.)  He spotted Ms. Jones under her covers and asked if she was "naked" under there.  (*Id.*)  Later that morning, according to Ms. Jones, she was working in the laundry trailer and had her keys on a lanyard around her neck underneath her shirt.  (Doc. No. 42-1, PageID# 501.)  Ms. Jones testified that Troy Jones came up from behind, put his hand under her shirt, asked what was under her shirt, lifted her shirt, and exposed and touched her stomach.  (*Id.*)

5

Later that same day, in an incident captured on video, Ms. Jones was leaning on a washing machine in the laundry trailer.  (*Id.* at PageID# 503; *see also* Defendant Ex. K, "Laundry Video.") The audio in the video is difficult to hear, but Troy Jones is observed talking to Ms. Jones as she attempts to lean away from him.  (*Id.*)  Ms. Jones testified that she asked Troy why he kept coming into the laundry trailer to see them and asked him, "Don't they want you out there?"  (Doc. No. 42-1, PageID# 503.)  At one point in the video, Troy looks behind him and then touches Ms. Jones on the back of the knee with a flashlight.  (*Id.*; *see also* Ex. K.)  According to Ms. Jones, she asked Troy why he touched her and Troy responded that he wanted to see where Ms. Jones "was weak."  (Doc. No. 42-1, PageID# 504.)  Troy admitted that he touched one of the plaintiffs on the leg but couldn't recall whether it was Ms. Cox or Ms. Jones.  (Doc. No. 42-7, PageID# 680.)  According to Troy, he asked Ms. Jones "about her health" and testified that she "looked dehydrated" and "looked pretty weak," and that, even though she told him she was fine, he tapped her on the back of the leg to test her reflexes for signs of dehydration.  (*Id.*)

The next day, Troy again approached Ms. Jones while she was working in the laundry trailer. (Doc. No. 42-1, PageID# 504.)  According to Ms. Jones, she was leaning on a table.  (*Id.*)  Ms. Jones testified that Troy told her, "You shouldn't be bending over like that.  Somebody like me might do something to you."  (*Id.* at PageID# 498.)  Ms. Jones testified that Ms. Cox heard this comment and that Ms. Jones told Troy to go away and that she didn't feel comfortable with him talking to her like that.  (*Id.*)  Later that day, Troy again attempted to enter Ms. Cox's and Ms. Jones's room in the trailer via the side door, which did not have the bedsheet tied to it.  (Doc. No. 42-1, PageID# 499.)  Ms. Jones asked if Troy was coming in to fix the air conditioning unit, which she and Ms. Cox requested

that he repair.  (*Id.*)  In response, Troy grabbed his crotch and said "No, deez nuts!" to Ms. Jones and left.  (*Id.*)

There is also video of another incident in which Troy allegedly entered Ms. Cox's and Ms. Jones's room unannounced and uninvited.  (*See* Defendant's Ex. I, "Roommate Video.")  This unannounced visit happened on or around April 7, 2020.  (Doc. No. 42-11.)  In the video, Ms. Cox says loudly to Troy, "This is our room!," and Ms. Jones immediately says to Troy, "Like, really, Troy, you pick on us on the sly." (Ex. I.)  Troy replies, "I pick on everybody." Ms. Jones responds by saying, "You want to know if I'm naked under [audio unclear]." (*Id.*)  Troy replies, "You're always under those covers." (*Id.*)  Ms. Cox and Ms. Jones then comment on how their room is always cold, and then Ms. Jones says, "That shower felt good." (*Id.*)  At that point, Troy turns and appears to leave their room.  (*Id.*)

### 3.    Ms. Cox and Ms. Jones Report Harassment to AFIMAC

According to Ms. Jones, Ms. Cox sent a text message to Threadgill complaining about Troy's harassment on April 8, 2020.  (Doc. No. 42-1, PageID# 506; *see also* 4/8/2020 Threadgill E-mail, Doc. No. 38-13.)  Threadgill forwarded a screenshot of Ms. Cox's text message to Zukowski, as well as two other AFIMAC corporate managers and Hatchell.  (Doc. No. 38-13.)  The screenshot of Ms. Cox's text message reads as follows:

> Troy, our supervisor, has been sexually harassing myself and Shelitha Jones since we began work.  He continues to come into our room, unannounced, and has witnessed us changing clothes.    Additionally, he has physically touched us and made inappropriate sexual comments.    We have objected to his behavior, however he continues to do this.  We are extremely uncomfortable and are afraid that we will lose our jobs.  Please let us know how you will handle this situation.  Thank you.

(*Id.*)  Zukowski responded that he would be unavailable for the next two hours but told Threadgill that he needed written statements from the two employees and directed him not to approach Troy at

7

that time. (Doc. No. 38-14.) Zukowski directed Threadgill to keep Ms. Cox and Ms. Jones separated from Troy if possible, if they felt uncomfortable around him. (*Id.*)

Around 2 or 3 p.m. that day, Hatchell approached Ms. Cox and Ms. Jones and explained that he needed written statements from both describing Troy's harassment. (Doc. No. 42-6, PageID# 658.) Hatchell testified that he did not obtain their written statements at that time, but did not feel "pressed for it, because [he] was busy running the camp." (*Id.*) Hatchell testified that he later returned to Ms. Cox and Ms. Jones and explained that he needed the written statements. (*Id.*) He testified that one of them was asleep and one was awake. (*Id.*) According to Hatchell, they asked him why the statements were necessary and that they "mentioned something about a lawyer" and explained that they did not understand why he needed the statements. (*Id.*) He testified that they eventually gave him the statements later that night. (*Id.* at PageID# 659.)

Ms. Jones recalled the statement process differently from Hatchell. (*See* Doc. No. 42-1, PageID# 509.) According to Ms. Jones, Hatchell told her that they needed to provide him with statements, so she and Ms. Cox returned to their trailer and completed their statements. (*Id.*) Ms. Jones did not indicate whether she and/or Ms. Cox were hesitant to provide written statements and whether they had or had not mentioned something about a lawyer.

After Ms. Jones and Ms. Cox wrote their statements, the second shift workers were coming on, sometime around 6 p.m. (*Id.*) At that point, a second-shift laundry worker, Percilla, approached Ms. Cox and said "Y'all brought that shit up here. We know y'all the ones that wrote those statements on Troy." (*Id.*) According to Ms. Jones, a physical altercation then broke out between Percilla, Ms. Cox, and several other AFIMAC food and laundry workers. (*Id.*) Ms. Jones subsequently admitted that she was not near Ms. Cox when the initial physical altercation began but testified that she heard

8

it begin in the break room.  (*Id.* at PageID# 509-10.)  Ms. Jones testified that by the time she arrived at the scene of the fight, a crowd of roughly 20 people had gathered and were attempting to fight Ms. Cox.  (*Id.*)

Ron Yake, the Cheniere project manager, broke up the fight and told Ms. Cox and Ms. Jones to get their stuff because they were being sent back to the hotel in Beaumont.  (*Id.* at PageID# 511.)  Ms. Jones and Ms. Cox rode back to Beaumont in Yake's truck.  (*Id.*)  When Ms. Cox and Ms. Jones asked Yake how other AFIMAC employees found out about their complaint, he allegedly told them that "everyone know [*sic*] who wrote the statements."  (*Id.* at PageID# 512.)  According to Ms. Jones, Ms. Cox told Yake that their complaint was supposed to have been confidential.  (*Id.*)

When Ms. Cox and Ms. Jones arrived back at the Beaumont Inn, they met with Yake, Hatchell, and Threadgill.  (*Id.* at PageID# 513.)  A hotel room was arranged for Ms. Jones and Ms. Cox to share in Beaumont that evening, April 8, 2020.  (*Id.*)  Later that evening, Ms. Cox and Ms. Jones exited their hotel room and saw Troy in the hallway, two doors down from their room.  (*Id.* at PageID# 514.)  Ms. Cox and Ms. Jones quickly returned to their room and shut the door.  (*Id.*)  According to Ms. Jones, Ms. Cox called one of the AFIMAC managers and told them that Troy was just down the hall from them at the hotel.  (*Id.*)  According to Threadgill, AFIMAC switched Ms. Jones's and Ms. Cox's hotel the next morning, on April 9, 2020, due to their complaint that Troy was in the hallway near their room at the Beaumont Inn.  (Doc. No. 42-5, PageID# 633.)

During his deposition, Troy denied ever being in the Beaumont hotel once Ms. Cox and Ms. Jones were moved offsite.  (Doc. No. 42-7, PageID# 682.)  However, according to an April 9, 2020 document titled "Troy Jones Counseling Session," Troy told Zukowski that he had stopped by the Beaumont Inn to see Threadgill and to pick something up to take back to the Cheniere site.  (Doc.

No. 38-20.)  Threadgill testified that he never investigated whether Troy was walking around the hotel.  (Doc. No. 42-5, PageID# 633.)  According to Threadgill, Troy was supposed to be "locked in" at the Cheniere site and was not supposed to leave.  (*Id.*)  He also testified that Troy was not removed from the site following the April 8, 2020 fight, nor assigned to stay at the Beaumont Inn that night. (*Id.*)  Threadgill did not know why Troy left the Cheniere site, or his reasons for doing so.  (*Id.* at PageID# 620-21.)

Around 9 a.m. on April 9, 2020, Zukowski sent an email confirming AFIMAC's corporate team's response to Ms. Cox's and Ms. Jones's allegations.  (Doc. No. 38-16.)  He confirmed that he still needed to receive their written statements, and that corporate would then review these as a group. (*Id.*)  According to Zukowski's email, once they had reviewed the written statements, he, Rob Shuster (AFIMAC's chief operating officer), and Richard Feronti (AFIMAC's director of operations) would have a conversation with Troy, and if they determined that the allegations were true, they would evaluate removing Troy from the project.  (*Id.*)  At 10 a.m., Feronti forwarded Zukowski Ms. Cox's and Ms. Jones's written statements, stating that "The statements were received later last night by Terry Hatchell after some resistance in [*sic*] the part of the alleged victims."  (Doc. No. 38-18.)

Sometime in the afternoon on April 9, 2020, Zukowski, Shuster, and Feronti conducted a telephonic "counseling session" with Troy.  (Doc. No. 38-20.)  Zukowski drafted the counseling session notes.  (*Id.*)  According to the counseling session summary, Troy denied ever physically touching either Ms. Cox or Ms. Jones, making inappropriate comments to them, or entering their room uninvited.  (*Id.*)  The management team also indicated that they reviewed the videos and did not see anything that indicated harassment.  (*Id.*)  The management team concluded that they could not confirm the allegations 100% either way, but that Troy was put on notice that any behavior of

10

this type would not be tolerated and that he would be removed as Ms. Cox's and Ms. Jones's supervisor. (*Id.*)

Although Zukowski's written summary of Troy's counseling session reflects that Troy was told he would no longer be Ms. Cox's or Ms. Jones's supervisor, this was not what AFIMAC management communicated to Ms. Cox and Ms. Jones that evening. According to Threadgill, he was told by Yake around 4 or 5 p.m. that Troy would remain food manager and that Ms. Cox and Ms. Jones could come back to work. (Doc. No. 42-5, PageID# 636.) Threadgill testified that he told Ms. Cox and Ms. Jones that they could go back to work and that Troy would remain their manager. (*Id.*) According to Threadgill, he gave Ms. Cox and Ms. Jones the choice to go back to work under Troy. (*Id.*) He told them that if they refused to go back, that would be considered "a refusal of work," which was "a form of quitting." (*Id.*)

Likewise, Ms. Jones testified that Threadgill told her and Ms. Cox that they "were to go back to work and [they] would still work up under Troy and [they] would still work in the same department." (Doc. No. 42-1, PageID# 515.) According to Ms. Jones, she remembered Threadgill and another AFIMAC employee, either named Shawn or LaShawn, telling her and Ms. Cox that they "had no choice but to go back because corporate had stepped in and it was out of [site management's] hands." (*Id.*) In response to learning that Troy would remain their supervisor, Ms. Jones and Ms. Cox told Threadgill that they feared Troy and did not want to remain under his management. (*Id.*) Threadgill again indicated that Ms. Cox's and Ms. Jones's options were to continue working for Troy or else leave. (*Id.*) Thereafter, Ms. Jones and Ms. Cox resigned from AFIMAC, left the hotel, and returned home to Alabama. (*Id.*)

**B.** **Procedural History**

Ms. Cox and Ms. Jones filed their Complaint in the Eastern District of Texas on February 5, 2021.  (Doc. No. 1.)  The case was transferred to the Northern District of Ohio upon joint motion of all parties on May 17, 2021.  (Doc. Nos. 7, 8, 9.)

In their Complaint, Ms. Cox and Ms. Jones asserted the following claims: (1) sexual discrimination and harassment pursuant to Title VII; (2) retaliation pursuant to Title VII; (3) invasion of privacy; (4) intentional infliction of emotional distress; (5) assault and battery; (6) negligent and/or wanton retention; (7) negligent and/or wanton supervision; and (8) negligent and/or wanton training. (Doc. No. 1, ¶¶ 85-152.)

On September 14, 2022, AFIMAC filed the instant Motion for Summary Judgment.  (Doc. No. 38.)  On October 18, 2022, Plaintiffs filed an Opposition, to which AFIMAC replied on November 1, 2022.  (Doc. Nos. 42, 43.)  Thus, the Motion is now ripe for a decision.

## II.   Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

12

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.  Analysis

As an initial matter, the Court must first address which of Plaintiffs' claims remain following the close of summary judgment briefing. AFIMAC moves for summary judgment on Counts One, Two, Three, Seven, and Eight. (Doc. No. 38, PageID# 279-86.) In their Opposition, Plaintiffs indicate that they have brought claims of sexual harassment and retaliation/constructive discharge under Title VII, as well as a claim for invasion of privacy under Ohio law. (Doc. No. 42, PageID#

466.)  However, Plaintiffs represent that they "are voluntarily dismissing their other Ohio state law claims."  (*Id.*)  Plaintiffs do not address AFIMAC's arguments in favor of summary judgment as to counts seven and eight in their Opposition.  (*See* Doc. No. 42.)  In its Reply, AFIMAC reasserts that it is entitled to summary judgment on Counts Seven and Eight.  (Doc. No. 43, PageID# 777.)

Accordingly, per Plaintiffs' Opposition, the Court dismisses Plaintiffs' Count Four, intentional infliction of emotional distress, Count Five, assault and battery, and Count Six, negligent and/or wanton retention, with prejudice.  Additionally, the Court concludes that AFIMAC is entitled to summary judgment as to Count Seven, negligent and/or wanton supervision, and Count Eight, negligent and/or wanton training.  The Court finds that Plaintiffs abandoned Counts Seven and Eight when they failed to address the claims in their Opposition after AFIMAC moved for summary judgment on these claims in its Motion.  As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc*., 545 Fed. Appx 368, 372 (6th Cir. 2013); *see also Wierengo v. Akal Sec., Inc*., 580 Fed. Appx 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal-and state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree."); *Hicks v. Concorde Career Coll*., 449 Fed. Appx 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

Thus, the only remaining claims in this case are Count One, sex discrimination and sexual harassment, Count Two, retaliation/constructive discharge, and Count Three, invasion of privacy.

14

### A. Count One: Sex Discrimination and Sexual Harassment

In Count One, Plaintiffs allege that they were subjected to discrimination and harassment based on their sex due to Troy Jones's repeated sexually offensive comments, touching, and other behavior. (Doc. No. 1, ¶¶ 85-94.)

In their Motion, AFIMAC argues that it is entitled to summary judgment on Count One because Plaintiffs' allegations are not credible and do not show any genuine issues of material fact. (Doc. No. 38, PageID# 281-82.) AFIMAC further argues that even if the Court believes Plaintiffs' allegations, the conduct is not severe or pervasive enough to create an environment that a reasonable person would find hostile *and* that Plaintiffs subjectively believed was hostile. (*Id.*) In response, Plaintiffs argue that AFIMAC's arguments focus mostly on the credibility of Plaintiffs' allegations and merely reflect defense counsel's self-serving opinion of what the videos show. (Doc. No. 42, PageID# 467.) Plaintiffs argue that AFIMAC's Motion should be denied because AFIMAC fails to meet its burden at the summary judgment stage, in that AFIMAC relies only on its counsel's opinions and interpretations of certain record evidence. (*Id.*) Plaintiffs further argue that Troy's harassment was both objectively and subjectively hostile, based on the record evidence. (*Id.* at PageID# 469-70.)

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile work environment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). This type of discrimination occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

15

victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (punctuation modified). Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult and thus prohibits conduct which is sufficiently severe and pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Lindsey v. Whirlpool Corp.*, 295 Fed. App'x 758, 765 (6th Cir. 2008).

To establish a hostile work environment claim, a plaintiff must show that: "(i) she was a member of a protected class; (ii) she was subjected to unwelcome harassment; (iii) the harassment was based on sex; (iv) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (v) there is a basis for employer liability." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (citing *Williams v. General Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999)). The parties' dispute centers on the second and fourth elements: whether Plaintiffs were subjected to unwelcome harassment, and whether Troy Jones's alleged conduct was severe or pervasive enough to establish an actionable hostile work environment claim.

1. **Unwelcome Harassment**

The Court concludes that there is a genuine issue of material fact as to whether Ms. Cox and Ms. Jones experienced unwelcome harassment. In their April 8, 2020 written statements, Ms. Cox and Ms. Jones described several instances of Troy Jones's unwelcome harassment experienced over the course of four days. (*See* Doc. Nos. 42-11, 42-12.) Further, in her deposition, Ms. Jones described in detail multiple instances of Troy Jones's harassment. (*See* Doc. No. 42-1.) Moreover, there is

16

record evidence to support Plaintiffs' assertion that this harassment was unwelcome.[2]  (*See* Doc. Nos. 42-1, 42-11, 42-12, Ex. I.)

AFIMAC's sole argument that Ms. Cox and Ms. Jones did not experience unwelcome harassment is that their allegations are not credible.[3]  (Doc. No. 38, PageID# 281-82.)  This argument is unpersuasive.  AFIMAC's attempts to dictate what an "ideal" response to sexual harassment should be are unconvincing.  For example, AFIMAC complains that Ms. Cox and Ms. Jones never say "[t]he words 'unannounced,' 'uninvited,' 'quit coming in the room,' 'why are you always in here,' or anything like it" in the "Roommate Video."  (Doc. No. 38, PageID# 272.)  However, AFIMAC disregards the record evidence that Ms. Cox and Ms. Jones, Troy Jones's subordinates, *did* tell Troy that his behavior was unwelcome—all while they lived alongside their alleged harasser and work supervisor in the same isolated compound.  (Doc. Nos. 42-1, 42-11, 42-12.)

The Court agrees with Plaintiffs that AFIMAC impermissibly asks this Court to weigh the credibility of Ms. Cox's and Ms. Jones's version of events against AFIMAC's version.  The Court may not judge credibility or weigh evidence when determining whether there is a genuine issue of material fact.  *See Anderson*, 477 U.S. at 255.  Ms. Jones's testimony alone creates a genuine issue of material fact as to whether she and Ms. Cox were subjected to unwelcome harassment.  *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006).  The Court may not disregard Ms. Cox's

---

[2] For example, Ms. Cox and Ms. Jones wrote that they tried to block and/or rig the doors on their trailer to prevent Troy Jones from coming in, that Ms. Jones asked Troy why he kept touching her, and that each of them felt scared of Troy. (Doc. Nos. 42-11, 42-12.)  In the video, Ms. Cox can be heard telling Troy that this was "their room." (Ex. I.)  In Ms. Jones's deposition testimony, she testified that she objected to Troy's behavior and feeling scared of Troy.  (*See, e.g.,* Doc. No. 42-1, PageID# 504-05, 514.)

[3] The Court notes that it is not nearly as concerned about Plaintiffs' counsel's margin size (*see* Doc. No. 43, PageID# 779) as it is about AFIMAC's counsel's opening salvo: that Ms. Cox and Ms. Jones "were poor employees who missed their first day of work, constantly complained, and solicited other employees for illegal drugs" and that they "even stole all the pots, pans, dishes, and silverware from their hotel room prior to leaving their job" when AFIMAC points to *absolutely no record evidence whatsoever* to support these aspersions.  (Doc. No. 38, PageID# 261.)  Counsel is hereby notified that the Court will not tolerate their inclusion of wholly unsubstantiated, defamatory assertions.

17

and Ms. Jones's written statements, nor Ms. Jones's detailed deposition testimony, simply because AFIMAC believes that Ms. Cox and Ms. Jones did not object strenuously enough on camera to Troy Jones's conduct.  (Doc. No. 38, PageID# 282.)

Moreover, AFIMAC asks this Court to credit Troy Jones's recollection of certain events over the Plaintiffs' recollections.  (*See, e.g.,* Doc. No. 38, PageID# 272.)  According to AFIMAC's Motion, Troy came into Ms. Cox's and Ms. Jones's trailer to inform them that he would be assigning additional people to stay in their trailer.  (*Id.*; *see also* Doc. No. 42-7, PageID# 687-88.)  AFIMAC claims that the assignment of new roommates to Ms. Cox's and Ms. Jones's trailer is what prompted Ms. Cox to yell "This is our room!" at the beginning of the video and is therefore "completely unrelated to any claim of harassment or Plaintiffs 'objecting' to him being in their room . . . ."  (*Id.*)  However, none of Troy's alleged comments about assigning new roommates are captured on the video, so all the Court is left with is the testimony of an alleged harasser pitted against the testimony of an alleged victim.  AFIMAC may present Troy's "perfectly reasonable explanation" to a jury, who can evaluate whether Troy's explanation for being in Ms. Cox's and Ms. Jones's room is credible or mere pretense for entering into their private living space again.[4]  Likewise, a jury may decide whether Ms. Jones or Troy Jones, an individual with no apparent medical training or expertise, tells a more credible account of the incident in which Troy Jones touched Ms. Jones's leg, either to check her for dehydration, or to further harass and intimidate her.  Accordingly, the Court concludes that facts exist upon which a reasonable jury could determine that, under Title VII, Ms. Cox and Ms. Jones were subjected to unwanted harassment.

---

[4] According to Threadgill, each private living space within the trailers was intended to house only two people per room. (Doc. No. 42-5, PageID# 619.)

18

2.       **Severity or Pervasiveness**

For alleged harassment to be actionable, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). "To determine whether an environment is sufficiently hostile or abusive, a court must consider 'all of the circumstances,' including the 'frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Lindsey*, 295 F. App'x at 766 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (cleaned up).

Here, the record contains evidence of myriad instances of harassment that took place over the course of four days. This alleged harassment was perpetrated by their supervisor and was ongoing, not merely sporadic. Troy's alleged harassment began at 6 a.m. on Ms. Cox's and Ms. Jones's first day of work, when Troy directed them to ride in his personal truck to the worksite, rather than in the work van. At that point, Troy allegedly used the time that they were in his personal vehicle to make an inappropriate sexual comment to Ms. Cox. (Doc. No. 42-1, PageID# 488.) That same day, Troy allegedly entered Ms. Cox's and Ms. Jones's trailer unannounced and saw Ms. Cox while she was changing her shirt and made another inappropriate and derogatory sexual comment to Ms. Cox. (*Id.* at PageID# 520.) Troy also allegedly made inappropriate sexual comments to Ms. Jones that bordered

19

on physical threats, including telling her not to bend over or he "might do something," and touching her leg with a flashlight because he "wanted to see where she was weak." (*Id.* at PageID# 504.) Troy also allegedly touched Ms. Jones inappropriately during work when he came up behind Ms. Jones, lifted her shirt, and touched her stomach without permission. (*Id.* at PageID# 501.) Troy also allegedly entered Ms. Cox's and Ms. Jones's private living space repeatedly without invitation or announcement, even after they told him that they were trying to keep him out of their living space. (*Id.* at PageID# 507.) During one such intrusion, Troy asked Ms. Jones whether she "was naked" under her bed covers. (*Id.* at PageID# 494.) During another intrusion, Ms. Jones asked whether Troy was coming in to fix their air conditioning unit, but Troy allegedly only responded by grabbing his genitals and yelling "No, deez nuts!" at Ms. Jones and leaving her trailer. (*Id.*) Moreover, after Ms. Cox and Ms. Jones submitted their formal written complaints about Troy's sexual harassment and were moved back to the Beaumont Inn, Troy was lingering only two doors down from Ms. Cox's and Ms. Jones's shared hotel room, without an apparent reason to be there. (*Id.* at PageID# 514)

Based on the numerosity of the incidents, their continual, daily nature, the explicitly sexual nature of several of the incidents, the fact that many of the incidents occurred inside of Plaintiffs' private living quarters, and the fact that the incidents were targeted specifically at Ms. Cox and Ms. Jones, the totality of the circumstances indicates that, at a minimum, a genuine issue of material fact exists as to whether the alleged harassment was sufficiently severe or pervasive such that it altered the conditions of Plaintiffs' employment and created a hostile working environment. *See, e.g., Thornton v. Federal Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (concluding that a genuine issue of material fact as to the fourth element of a plaintiff's *prima facie* case existed because the plaintiff's supervisor's "continuous preoccupation with sex talk and persistent unwelcome advances,

often targeted at plaintiff, were degrading, offensive, increasingly intimidating and inexcusable" ). In particular, the incidents described throughout the record, including a supervisor's repeated unannounced entrances into his subordinates' private living space, combined with the supervisor's comments that he "might do something" to Ms. Jones and wanted to see "where she was weak," go far beyond "simple teasing, offhand comments, and isolated incidents." *Id.* Rather, these incidents are "physically threatening [and] humiliating." *Id.* A reasonable jury could conclude that a reasonable person, directly subordinate to Troy Jones and required to live alongside him in the same compound, would find the work environment offensive. *Id.*

AFIMAC's argument that the Court should question why two alleged victims of sexual harassment did not appear sufficiently "afraid" or did not object strenuously enough to Troy's presence on one video is unavailing. (Doc. No. 38, PageID# 282-83.) Again, AFIMAC impermissibly asks the Court to evaluate Ms. Cox's and Ms. Jones's credibility. The Court will not guess why Ms. Cox and Ms. Jones did not engage their alleged harasser in a hostile confrontation *inside of their own private living space* after he told one of them that he "might do something" to her and made repeated unwelcome sexual comments to both.

Accordingly, the Court concludes that AFIMAC is not entitled to summary judgment with respect to Plaintiffs' Title VII hostile work environment sexual harassment claim.

**B.     Count Two: Retaliation/Constructive Discharge**

In Count Two, Plaintiffs allege that they engaged in protected activity by complaining about Troy Jones's alleged sexual harassment and, as a result, "were harassed, attacked, threatened, and terminated." (Doc. No. 1, ¶¶ 96-103.) Plaintiffs allege that they were "subjected to adverse actions"

and "were constructively discharged as their working conditions were so intolerable, they were forced to quit."  (*Id.*)

In their Motion, AFIMAC argues that it is "undisputed" that AFIMAC did not take any adverse employment action against Plaintiffs for reporting Troy Jones.  (Doc. No. 38, PageID# 284.) AFIMAC asserts that Plaintiffs were told that "they could keep their same jobs with no change in employment status," even though Threadgill "incorrectly told the Plaintiffs—contrary to the direction given to him by corporate—that they would continue reporting to Troy Jones . . . ."  (*Id.*)

In response, Plaintiffs argue that they suffered an adverse employment action because they were constructively discharged when they were told that they could either return to the work site and continue to work for Troy Jones, or else quit.  (Doc. No. 42, PageID# 472-73.)  Plaintiffs argue that AFIMAC failed to refute Plaintiffs' assertion that they were constructively discharged.  (Doc. No. 42, PageID# 472-73.)  Plaintiffs argue that they offer sufficient evidence to establish a question of material fact as to whether they were constructively discharged, and that Plaintiffs' quitting was a foreseeable consequence of AFIMAC's actions.  (*Id.*)

In its Reply, AFIMAC argues for the first time that Plaintiffs cannot maintain their retaliation claim because they failed to establish a causal connection between their protected activity and the adverse employment action.  (Doc. No. 43, PageID# 786.)  Though AFIMAC clearly argued in its initial Motion *only* that Plaintiffs failed to show an adverse employment action, AFIMAC asserted the following in its Reply:

> In "response" to this argument, Plaintiffs spend almost two pages arguing that AFIMAC failed to demonstrate that Plaintiffs had not suffered an adverse employment action. (*See* Doc. 42, PageID 472-474.)  **Once again, that is not AFIMAC's argument. The prong of the prima facie test that Plaintiffs fail is in demonstrating that there was a causal connection between a protected activity and the adverse employment action**, even assuming there was the latter. *See Abbott v. Crown Motor*

22

> *Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Plaintiffs must demonstrate that AFIMAC
> "constructively discharged" them because they complained about Troy (i.e., a causal
> connection).

(Doc. No. 43, PageID# 786.)

> Title VII provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made an
> unlawful employment practice by this subchapter, or because he has made a charge,
> testified, assisted, or participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff may rely on either direct or circumstantial evidence to establish

that an employer engaged in retaliation. *Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 291 (6th

Cir. 2017). Plaintiffs offer only indirect evidence of retaliation. Consequently, the *McDonnell*

*Douglas* burden-shifting framework applies. *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir.

2013). "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of

retaliation." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014). "If the plaintiff

succeeds in making out the elements of a prima facie case, the burden of production shifts to the

employer to articulate some legitimate, non-discriminatory reason for its actions." *Id.* Finally, "[i]f

the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate

that the defendants' proffered reason was not the true reason for the employment decision." *Id.*

To "establish a prima facie case of retaliation [under Title VII,] a plaintiff must establish that:

(1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the

defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff;

and (4) a causal connection existed between the protected activity and the materially adverse action."

*Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (internal quotation marks

omitted). And "the final element requires proof of so-called 'but-for' causation," i.e., that the unlawful retaliation would not have occurred but for the employee's protected conduct. *See Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018); *MacEachern v. Quicken Loans, Inc.*, No. 17-1005, 2017 WL 5466656, at *5 (6th Cir. Oct. 17, 2017). "'Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently than similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.'" *Henry*, 651 F. App'x at 505 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)).

The Court turns to AFIMAC's first argument, that Plaintiffs did not establish an adverse employment action. Plaintiffs argue that they suffered an adverse employment action when they were constructively discharged. (Doc. No. 42, PageID# 473.) Therefore, the Court must examine the law of constructive discharge before returning to its analysis of Plaintiffs' retaliation claim.

According to the Supreme Court,

The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. *Id.*, at 142–143, 124 S.Ct. 2342.

A claim of constructive discharge therefore has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. *Id.*, at 148, 124 S.Ct. 2342. But he must also show that he actually resigned. *Ibid.* ("A constructive discharge involves both an employee's decision to leave and precipitating conduct ..." (emphasis added)). . . .

*Green v. Brennan*, 578 U.S. 547, 555 (2016). It is undisputed that Ms. Cox and Ms. Green resigned from AFIMAC on the evening of April 9, 2020. (Doc. No. 42-1, PageID# 515.) Therefore, the only

24

element in dispute is whether a reasonable person in Ms. Cox's or Ms. Jones's position would have felt compelled to resign.[5] *Green*, 578 U.S. at 555.

The Sixth Circuit considers several factors in deciding whether the first requirement is satisfied:

> Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

The only factor that appears to apply to the instant case is factor six, regarding badgering, harassment, or humiliation. The Sixth Circuit has suggested that constructive discharge can be found by the presence of this factor alone. *See, e.g., Logan*, 259 F.3d at 569 (noting that these factors can

---

[5] Recently, a court within the Middle District of Tennessee noted that, previously, the Sixth Circuit "used to say that to show a constructive discharge, a plaintiff must show 1) that the employer created working conditions that are intolerable from a reasonable person's point of view, and 2) that the employer did so with the intent of forcing the employee to quit." *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-00491, 2022 WL 1283087, at *38 (M.D. Tenn. Apr. 28, 2022). The *Benitez* court pointed out that while the first element survived the Supreme Court's 2016 ruling in *Green*, the second element, that the employer intended to force the employee to quit, did not. *Id.* Indeed, the *Green* court reasoned that it did "not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly— that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along." *Id.*, quoting *Green*, 578 U.S. at 560. However, the *Benitez* court also noted that the Sixth Circuit's caselaw post-*Green* does not always excise the outdated requirement that an employee demonstrate that an employer intended to force the employee to quit. *Id.*, citing *Lee v. Cleveland Clinic Found.*, 676 Fed. App'x 488, 495 (6th Cir. 2018) (requiring employee to demonstrate that her employer intended to make her quit). Indeed, in Plaintiffs' Opposition, Plaintiffs argue that they "must establish some level of intent on Defendant's behalf" and that, in the Sixth Circuit, this intent can be demonstrated by showing that "quitting was a foreseeable consequence of the employer's actions." (Doc. No. 42, PageID# 474.) Even if this outdated requirement were mandatory post-*Green*, the Court concludes that Plaintiffs have established that their quitting was a foreseeable consequence of AFIMAC's actions because AFIMAC, through Threadgill, gave Ms. Cox and Ms. Jones two choices: either continue working for, and living alongside, their alleged harasser, or quit. (Doc. No. 42-1, PageID# 515.) Given such a choice, it was reasonably foreseeable that Plaintiffs would quit.

be considered "singly or in combination"); *West v. Tyson Foods, Inc.*, 374 Fed. App'x 624, 640 (6th Cir. 2010) (concluding that there was sufficient evidence for a jury to conclude that the plaintiff had been constructively discharged due to the "numerous incidents" of "intolerable" harassment he suffered due to coworker conduct); *Lee v. Cleveland Clinic Found.*, 676 Fed. App'x 488, 495-96 (6th Cir. 2018). However, the Sixth Circuit has also rejected constructive discharge claims at the summary judgment stage where the "[p]laintiff's evidence of harassment and disparaging comments were isolated to only a few incidents and by a few individuals and were not pervasive enough to significantly alter [the plaintiff's] working conditions." *Cleveland v. S. Disposal Waste Connections*, 491 Fed. App'x 698, 708 (6th Cir. 2012). Thus, "badgering, harassment, and humiliation" alone can effectuate a constructive discharge, but it must be pervasive enough to significantly alter the plaintiff's working conditions.

Here, the Court concludes that there is a genuine issue of material fact as to whether Plaintiffs were discriminated against by AFIMAC to the point where a reasonable person in their positions would have felt compelled to resign. As discussed at length above, Plaintiffs have produced evidence that they were subjected to multiple instances of sexual harassment and humiliation by their supervisor Troy Jones every day for the four days that they were present at the Cheniere site. *See supra*. Moreover, after Plaintiffs were removed from the work site, Troy appeared only two doors down from their hotel room, in an apparent violation of AFIMAC's lockdown policy and with no apparent reason to be there. *Supra*. Finally, it is undisputed that Threadgill told Ms. Cox and Ms. Jones that they could either return to the Cheniere site and work for, and live alongside, Troy Jones, or else quit. (Doc. No. 42-1, PageID# 515; Doc. No. 42-5, PageID# 636-37.) Whether Threadgill, an AFIMAC manager, was mistaken is irrelevant. There is no evidence to suggest that Ms. Cox and

26

Ms. Jones knew or should have known when they were presented with Threadgill's directive on April 9, 2020 that he supposedly made a mistake. Moreover, it is unclear from the record whether Threadgill indeed made a mistake, since AFIMAC's corporate managers' testimonies conflict about the message meant to be communicated to Plaintiffs, and who was responsible for communicating that message.[6] Accordingly, there are sufficient facts upon which a reasonable jury could conclude that a reasonable person would have felt compelled to resign.

Having concluded that there is a genuine issue of material fact as to whether a constructive discharge, and therefore an adverse employment action, occurred, the Court returns to its retaliation analysis and now addresses AFIMAC's new argument in its Reply, that Plaintiffs failed to establish a causal connection between their protected activity and the adverse employment action. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018).

AFIMAC asserts that the moment that Threadgill "undisputedly told Plaintiffs that the investigation was over and that they could go back to work, any potential retaliation claim was extinguished." (Doc. No. 43, PageID# 786.) The Court disagrees. First, the Court rejects this argument because AFIMAC only raised it for the first time in its Reply brief. It is well established that courts will not normally consider issues raised for the first time in Reply Briefs, as it deprives the non-movant of a full and fair opportunity to respond. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir.2008) (explaining that "reply briefs reply to arguments made in the response brief— they do not provide the moving party with a new opportunity to present yet another issue for the

---

[6] Zukowski testified that it was Feronti's responsibility to tell Ms. Cox and Ms. Jones that they could return and *not* work for Troy. (Doc. No. 42-2, PageID# 564.) However, Feronti testified that he believed Ron Yake was trying to communicate with Plaintiffs when they "self-terminated." (Doc. No. 42-15, PageID# 767.) As discussed above, Threadgill testified that Yake told him that Troy would remain as manager and Plaintiffs must return to work. (Doc. No. 42-5, PageID# 636-67.)

court's consideration") (emphasis in original) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 676 (6th Cir. 2006) (stating that "[i]t is impermissible to mention an issue for the first time in a reply brief because the [opponent] then has no opportunity to respond") (quoting *Knighten v. Commissioner*, 702 F.2d 59, 60 n.1 (5th Cir. 1983)).

Second, even assuming arguendo that AFIMAC had raised this argument in its initial Motion, the Court would still find it to be without merit. To establish a causal connection, a plaintiff must "'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted)). "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007). "One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor*, 703 F.3d at 339 (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)).

The Court concludes that there is sufficient evidence to establish a causal connection. AFIMAC took only one day to investigate Plaintiffs' complaint, in which they spoke only to Troy Jones, but not to either Ms. Cox or Ms. Jones, before Threadgill issued the directive that they must either continue working for Troy or else quit. (Doc. Nos. 42-4, PageID# 547; 42-1, PageID# 515; 42-5, PageID# 636.) A jury could reasonably conclude that AFIMAC's investigation into Ms. Cox's and Ms. Jones's allegations was cursory and that AFIMAC accepted Troy's version of events after a

brief investigation.  Because of the short temporal proximity between Ms. Cox's and Ms. Jones's complaint and Threadgill's directive, and AFIMAC's potentially cursory investigation, the Court concludes that Plaintiffs can establish a causal connection between their protected activity and AFIMAC's adverse employment decision.  Therefore, Plaintiffs can establish a *prima facie* case of retaliation under Title VII.

Because Plaintiffs can establish a *prima facie* case of retaliation, the burden shifts to AFIMAC "to articulate some legitimate, non-discriminatory reason for its actions." *Goodsite*, 573 F. App'x at 582.  If AFIMAC satisfies its burden of production, the burden shifts back to Plaintiffs to demonstrate that AFIMAC's proffered reason was mere pretext.  *Id.*  AFIMAC does not proffer a legitimate, non-discriminatory reason for its action, nor address pretext.  (*See* Doc. No. 38.)  Accordingly, the Court concludes that AFIMAC is not entitled to summary judgment on Plaintiffs' retaliation claim.

### C.      Count Three: Invasion of Privacy

In Count Three, Plaintiffs allege that AFIMAC invaded their privacy by, among other things, sexually harassing Plaintiffs, including through sexually inappropriate comments, propositions, and touching, that AFIMAC ratified the conduct of its employees, and that this conduct intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs.  (Doc. No. 1, ¶¶ 107-08, 111.)

In its Motion, AFIMAC argues that Count Three fails because Plaintiffs did not allege any facts in their Complaint that would satisfy any of Ohio's four types of invasion-of-privacy tort.  (Doc. No. 38, PageID# 284-85.)  Specifically, AFIMAC asserts that Plaintiffs fail to allege any facts in Count Three that would satisfy the requirements of the intrusion-upon-seclusion type of invasion of privacy.  (*Id.*)  AFIMAC argues that Plaintiffs do not allege that Troy's repeated uninvited entrances

29

into their room forms the basis of this claim in their Complaint, so Plaintiffs cannot allege an intrusion-upon-seclusion invasion of privacy claim.  (*Id.*)

In their Opposition, Plaintiffs argue that they can establish an intrusion-upon-seclusion invasion of privacy claim under Ohio law because the area that Troy intruded upon was private, and his intrusion was unwarranted and offensive or objectionable to a reasonable person.  (Doc. No. 42, PageID# 474.)  Plaintiffs further argue that AFIMAC is liable for Troy's invasion of privacy because AFIMAC ratified Troy's conduct by failing to provide lodging with locking doors, failing to conduct an investigation into their complaints, failing to interview Plaintiffs and their witness, and failing to provide Plaintiffs with a solution that would protect them from Troy's harassment.  (*Id.* at PageID# 475.)  AFIMAC does not address Plaintiffs' counterarguments regarding Count Three in its Reply. (*See* Doc. No. 43.)

Under Ohio law, a plaintiff may raise an "invasion-of-seclusion" type of invasion of privacy claim.  *Eysoldt v. ProScan Imaging*, 957 N.E.2d 780, 786 (Ohio Ct. App. 1st Dist. 2011).  "These types of claims arise when a 'wrongful intrusion into one's private activities' occurs 'in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Id.* at 786-87 (quoting *Welling v. Weinfeld*, 113 Ohio St.3d 464, 467 (Ohio 2007).  Ohio courts apply a two-prong standard for establishing such a claim.  First, a plaintiff must "produce evidence that the area intruded upon was private," and second, a plaintiff must show "that the intrusion was unwarranted and offensive or objectionable" to a reasonable person.  *Contadino v. Tilow*, 589 N.E.2d 48, 53 (Ohio Ct. App. 1st Dist. 1990).

However, Plaintiffs assert this claim against AFIMAC, *not* Troy Jones.  Thus, the Court must address whether there is a sufficient basis for Plaintiffs to proceed on this claim against AFIMAC.

Plaintiffs briefly argue that AFIMAC can be held liable for Troy's intentional tort because AFIMAC ratified Troy's conduct.  (Doc. No. 42, PageID# 475.)  AFIMAC does not address this argument in its Reply.  (*See* Doc. No. 43.)

The doctrine of respondeat superior "imposes liability upon an employer for the acts done by an employee in the course and scope of employment."  *Amato v. Heinika Ltd.*, 2005 WL 110441, at *1 (Ohio Ct. App. 8th Dist. Jan. 20, 2005).  Ohio law generally does not impose liability on an employer "when an employee commits an intentional tort [because] it is assumed that the employee did not act within the course and scope of employment, for intentional torts generally encompass bad acts which have no place in the employment relation."  *Id.* (citing *Byrd v. Faber*, 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (Ohio 1991)).

However, an "exception to liability for intentional torts occurs when the employer ratifies the employee's act, in essence adopting it as the employer's own."  *Id.*  Although Ohio law "has long rejected the notion of ratification by silence . . . the current view is that silence can sometimes express intent as loudly as words. There are situations where one would expect a principal to act, and thus the failure to act can be viewed as a manifestation of intent to ratify the agent's act."  *Id.* (cleaned up); *see also Barrow v. Living Word Church*, No. 3:15-cv-341, 2017 WL 660603, at *3 (S.D. Ohio Feb. 14, 2017).  "A plaintiff must show ratification only where the employee's actions are outside the scope of employment."  *Riotte v. Cleveland*, 960 N.E.2d 496, 501 (Ohio 8th Dist. Ct. App. 2011) (citing *Fulwiler v. Schneider*, 662 N.E.2d 82, 87 (Ohio 1st Dist. Ct. App. 1995)).

An employer "ratifies the unauthorized act of his agent if the 'principal, with full knowledge of the facts, conducts himself in a way which manifests his intention to approve an earlier act performed by his agent which did not bind him.'"  *McKee v. McCann*, 95 N.E.3d 1079, 1095 (Ohio

8th Dist. Ct. App. 2017) (quoting *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 62 Ohio App.3d 604, 611 (Ohio 8th Dist. Ct. App. 1989)).  "To constitute ratification of employee conduct outside the scope of employment, the ratified conduct must further or promote the employer's business." *Id.* (citing *Martin v. Cent. Ohio Transit Auth.*, 70 Ohio App.3d 83, 92 (Ohio 10th Dist. Ct. App. 1990)).  "The continued employment of an individual who committed an intentional tort is not, in and of itself, enough to show ratification by an employer." *Fulwiler*, 662 N.E.2d at 87.

The Court concludes that AFIMAC is entitled to summary judgment as to Count Three. Plaintiffs fail to offer sufficient evidence to demonstrate a genuine issue of material fact as to whether AFIMAC ratified Troy's conduct.  Plaintiffs argue that AFIMAC ratified Troy's conduct by failing to provide lodging with doors that locked.  (Doc. No. 42, PageID# 475.)  However, AFIMAC provided such lodging *before* it became aware of Troy's repeated invasions of Plaintiffs' privacy, so it cannot be that this evidence supports Plaintiffs' assertion of ratification.  *See Amato*, 2005 WL 110441, at *2 (noting that "ratification must follow knowledge of the facts.").  Plaintiffs also argue that AFIMAC ratified Troy's conduct by failing to interview Plaintiffs or their witness, Glen Derrick Johnson.  (Doc. No. 42, PageID# 475.)  However, Ms. Jones testified that she never saw Johnson interact with Troy.  (Doc. No. 42-1, PageID# 495.)  While Ms. Jones and Ms. Cox may have told Johnson about Troy's repeated alleged harassment, Plaintiffs offer no evidence to suggest that Johnson witnessed any of Troy's alleged harassment.  Thus, there is little reason to believe that the results of AFIMAC's investigation would have been different if AFIMAC's corporate employees had spoken to Johnson.  Likewise, it is unclear if the results of AFIMAC's investigation would have been different if the corporate employees had interviewed Plaintiffs.  The counseling session notes indicate that the AFIMAC corporate employees relied on Plaintiffs' written statements, as well as their phone

conversation with Troy, and were unable to confirm Plaintiffs' "allegations either way." (Doc. No. 38-20.) Even if AFIMAC's corporate employees had interviewed Plaintiffs over the phone, they would still have been left to determine Troy's culpability based on the parties' competing versions of events.

Although Plaintiffs assert that Troy was never disciplined, and no record of these events was placed in his personnel file, Zukowski's written summary of Troy's counseling session reflects that Troy *was* warned during that conversation in no uncertain terms that AFIMAC would not tolerate such conduct. (Doc. No. 38-20.) Zukowski wrote that at the end of the counseling session, Troy "was put on notice if he did or did not commit the items brought to [AFIMAC's attention], any behavior of that type will not be tolerated in the workplace and that [AFIMAC] will be monitoring his interactions with employees moving forward." (*Id.*) Further, Troy was informed that he would be removed as Ms. Jones's and Ms. Cox's supervisor, that he was not permitted to have any further interaction with Ms. Jones and/or Ms. Cox, that he was not to enter any employee's room in the future, whether a male or female employee, and that "any infractions of any areas discussed will result in termination of employment." (*Id.*) AFIMAC's actions, including informing Troy that he would no longer be Plaintiffs' supervisor and that he was prohibited from any further interactions with them, as well as AFIMAC's warnings that it would monitor his future interactions with employees would terminate his employment if he failed to comply, do not "manifest[ AFIMAC's] intention to approve an earlier act performed" by Troy. *See McKee*, 95 N.E.3d at 1095.

Accordingly, the Court concludes that Plaintiffs' Count Three fails as a matter of law.

33

## IV.    Conclusion

Accordingly, for the reasons set forth above, AFIMAC's Motion for Summary Judgment (Doc. No. 38) is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED.**


 s/Pamela A. Barker
PAMELA A. BARKER
Date:  December 12, 2022                     U. S. DISTRICT JUDGE